# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 2897 | **DATE** | July 29, 2004 |
| **CASE TITLE** | SEC vs. PHOENIX AVATAR et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) Status hearing is set for

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10)■ [Other docket entry] Enter Memorandum Opinion and Order granting preliminary injunction. The parties are directed to conduct an FRCP 26(f) conference and file a form 35 by August 17, 2004. Status hearing to set a discovery and trial schedule is set for August 31, 2004 at 9:00 am.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original inute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| ✓ | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

JS ✓ courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
2004 JUL 30 AM 8: 01

Date/time received in central Clerk's Office

number of notices

7/30/04 date docketed

docketing deputy initials

7-29-04 date mailed notice

mailing deputy initials

Document Number

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | **DOCKETED** |
| | ) | |
| Plaintiff, | ) | JUL 3 0 2004 |
| | ) | No. 04 C 2897 |
| v. | ) | |
| | ) | |
| PHOENIX AVATAR, LLC d/b/a | ) | |
| AVATAR NUTRITION; DJL, LLC; | ) | |
| DANIEL J. LIN; MARK M. SADEK; | ) | |
| JAMES LIN; and CHRISTOPHER M. | ) | |
| CHUNG d/b/a AIT HERBAL MARKETING | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

JAMES F. HOLDERMAN, District Judge:

Before this court is the Federal Trade Commission's ("FTC") request for a preliminary injunction to be entered against defendants Daniel J. Lin, Mark M. Sadek, James Lin, and Christopher Chung. A Temporary Restraining Order ("TRO") against these defendants was entered on April 23, 2004 (Dkt. No. 6) and has continued by consent pending this ruling. Defendants Phoenix Avatar, LLC and DJL, LLC have failed to appear and a preliminary injunction was entered against these defendants on May 6, 2004. (Dkt. No. 14.) The request for a preliminary injunction against remaining defendants Daniel Lin, Mark Sadek, James Lin, and Christopher Chung is based on purported violations of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM"), 15 U.S.C. § 7701 et seq. and 15 U.S.C. §§ 45(a), 52(a) ("FTC Act"). For the following reasons, the request for a preliminary injunction is granted.

1



## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1337(a) & 1345. The defendants have made a request that this action be transferred to the United States District Court for the Eastern District of Michigan for further proceedings, or, in the alternative, for this court to stay these proceedings. Neither of these requests are supported with any argument or law and are denied. Venue is appropriate in the Northern District of Illinois because defendants have transacted business here[1], see 15 U.S.C. § 53(b), and defendants have provided no sufficient reason why these proceedings should be stayed.

## FINDINGS OF FACT

Based on the evidence presented in the record, the court makes the following factual findings.

I.     Background: FTC's Preliminary Investigation Which Led to Avatar

Theresa J. Bresnahan ("Bresnahan"), paralegal specialist with the FTC, presented most of the FTC's evidence in support of a preliminary injunction. Bresnahan testified that an e-mail consists of two parts, a header and a body.[2] (PX 1.) Among other things, the header usually contains identifying information fields such as the intended recipient, the sender of the e-mail, the date, and a subject line. Oftentimes, the e-mail body will contain a hyperlink, which is a link to a specific Web site on the Internet. When a user "clicks" on a hyperlink, that user's Internet browser opens up on the specified Web site. A domain name, which is usually purchased by a user, is a unique name that identifies a Web site. For example, www.xyz.com. A sub-page designation identifies subsequent

---

[1] See (PX 1, ¶¶ 13-28); (PX 1 ¶ 23, Att. J at 5); (PX 1 ¶¶ 32-33); (PX 1, ¶ 35(d)).

[2] Bresnahan submitted declarations. At the hearing, Bresnahan briefly testified on direct, affirming these previous declarations. For convenience, the court refers to statements in Bresnahan's declarations as testimony.

Web pages within the main Web site. For example, "info" is the sub-page designation in www.xyz.com/info, and clicking on this as a hyperlink would take the user to the "info" sub-page within the www.xyz.com Web site.

According to Bresnahan, Internet promoters will often use an "affiliate system" to promote their products or services. Promoters recruit affiliates to assist in advertising, oftentimes resulting in affiliates sending out e-mails advertising the promoter's product. Affiliates are ordinarily paid on a commission basis and are assigned a unique identifier or "affiliate moniker." This affiliate moniker is usually appended to the end of a hyperlink contained in an e-mail advertising the promoter's product. The affiliate moniker allows the promoter to track the affiliate's success, and allows the affiliate to obtain commissions. For example, in the hyperlink www.xyz.com/info/?id=123, "123" is the affiliate moniker. The promoter is able to track sales generated by this hyperlink to the person assigned the particular affiliate moniker "123."

Bresnahan testified that the FTC maintains, for law enforcement purposes, an e-mail address where consumers can forward unsolicited commercial e-mail messages, commonly referred to as "spam." These e-mails are stored in a searchable database ("spam database"). As part of her duties as a paralegal specialist with the FTC, Bresnahan was asked to search the FTC's spam database as well as commercial Internet newsgroups for suspected misleading or deceptive spam. After reviewing a number of spam messages containing a variety of domain names, Bresnahan began to recognize two similarities among certain hyperlinks. First, she noticed that the structure of certain hyperlinks was similar in that these hyperlinks shared similar sub-page designations ending in similar affiliate monikers. For example, Bresnahan testified that a typical hyperlink in the spam she reviewed was formatted as follows: "www.keepyourmatehappy.biz/m2/index.php?_aff_id=m4," or

3

"www.countupandlookaway.com/m2/index.php?aff_id=m4." Second, Bresnahan began to notice that hyperlinks with these similar sub-page designations were linked to Web sites selling certain products. For example, hyperlinks containing the sub-page designation "m2" were linked to Web sites selling the Med Diet Patch, a purported weight-loss product.

Finally, Bresnahan began to notice that the hyperlinks described above, containing similar sub-page designations and affiliate monikers, frequently linked to Web sites with similar looking content. The hyperlinks with similar sub-page designations and affiliate monikers led to Web sites with similar content even though the domain names were often different. This led Bresnahan to draw the inference that this certain variety of domain names she encountered were all related to the same enterprise. As a result of this inference, Bresnahan and others at the FTC began to compile a list of all these domain names they believed to be related. The FTC designated these related domain names the "Avatar" domain names. According to Bresnahan, the FTC identified 108 Avatar domain names. (PX 1, Att. A.)

In the course of this investigation, FTC personnel visited the Web sites of domain name registrars to obtain information on who had registered the various Avatar domain names. The 103 Avatar domain names for which domain name registration information was available are purportedly registered to twenty-two persons or entities located in various countries throughout the world, including: South Africa, Lithuania, India, Singapore, Taiwan, Korea, France, Russia, Argentina, Malaysia, Turkey, Mexico and China. (PX 1, Att. B.)

II.     Undercover Purchases

For purposes of investigating the Avatar domain names, Bresnahan posed as a consumer, using an alias and undercover information, including a shipping address, telephone line, e-mail

address and a VISA credit card account. Bresnahan made four purchases from Web sites with Avatar domain names, two of which are relevant to the instant request for a preliminary injunction. Bresnahan linked to these Web sites by clicking on hyperlinks contained in spam received from the spam database or commercial Internet news groups.

### A. First Undercover Purchase: Med Diet Patch from countupandlookaway.com

On January 9, 2004, Bresnahan used a personal computer to visit the Web site www.countupandlookaway.com/m2/index.php?AFF_ID=m4 ("countupandlookaway.com"), for the purpose of purchasing the product sold on that Web site, a Med Diet Patch. A printed copy of the countupandlookaway.com Web site was admitted into evidence. (PX 1, Att. C.) The home page, or initial page encountered when visiting countupandlookaway.com, included five links leading to five separate sub-pages: PRODUCT INFO, TESTIMONIALS, FAQ'S, CONTACT, ORDER NOW. Despite the sub-page entitled CONTACT, this Web site contained no information identifying the seller. There was no telephone number, address, e-mail address or other identifying information. The CONTACT sub-page purportedly allowed a consumer to contact the seller by submitting an online form. (PX 1, Att. C, p. 6.)

To purchase the Med Diet Patch, Bresnahan clicked on the hyperlink "ORDER NOW" which took her Internet browser to the sub-page used to place orders ("Order Page"). (PX 1, Att. C at 8-9.) The Order Page was entitled "Diet Patch Secure Order Form," and it required the entry of identifying and payment information. Bresnahan entered the corresponding undercover information and clicked on a button marked "Click to Authorize" to complete the $59.95 purchase for the Med Diet Patch.[3]

---

[3] The completed Order Page was admitted into evidence with the undercover FTC information redacted. See (PX 1, Att. C at 8-9.)

After submitting the order, Bresnahan's Internet browser was directed to a confirmation page. This page stated that the charge appearing on the FTC's undercover credit card would appear as "AIT" or "MYPAYSYSTEMS." (PX 1., Att. C at 10.)

MyPaySystems is a credit card processor located in Quebec, Canada, which maintains its own Web site: www.mypaysystems.com. This Web site allows consumers to inquire about credit card charges processed by MyPaySystems. Upon entering the credit card information used to make a purchase processed through MyPaySystems, a consumer can access an "Order Details" page produced by MyPaySystems. With respect to Bresnahan's purchase of the Med Diet Patch, on January 14, 2004, MyPaySystems listed the Vendor Company Name as "PHOENIX AVATAR, LLC," the Vendor's Customer Support Line as (866) 248-1101, and the Vendor's Web site as www.avatarnutrition.com. See (PX1, Att. D.)

On or about January 14, 2004, a package was received in response to Bresnahan's undercover purchase of the Med Diet Patch. The package was addressed to the undercover alias used by Bresnahan and it was marked as having been sent by Avatar Nutrition at P.O. Box 251570, West Bloomfield, Michigan. See (PX 1, Att. F.) Contained in the package was an invoice dated January 9, 2004, from "AIT Herbal Marketing/Avatar Nutrition." (PX 1, Att. H.) The telephone number appearing on the invoice – (866) 248-1101 – was the same telephone number appearing on the MyPaySystems's Order Details page. The invoice also listed an e-mail address at support@aitmarketing.com, and a Web site address at www.avatarnutrition.com. A printed copy of www.avatarnutrition.com was entered into evidence. (PX 1, Att. I.) The package contained a product called "Premium Diet Patch." (PX 1, Att. G.)

### B. Second Undercover Purchase: Slim Form Patch from keepyourmatehappy.biz

On February 24, 2004, Bresnahan purchased a product entitled Slim Form Patch from www.keepyourmatehappy.biz/m2/index.php?AFF_ID=4 ("keepyourmatehapppy.biz"). (PX 1, Att. J at 1-9.) This Web site was similar to the countupandlookaway.com Web site in that it contained no information identifying the seller. In a manner similar to the first undercover purchase, Bresnahan submitted a $59.95 order for a Slim Form Patch, and just as with the first purchase, her Internet browser was directed to a confirmation page that informed her the charge appearing on her credit card statement would appear as "AIT." (PX 1 at 12.)

In response to this purchase, the FTC's undercover credit card account was billed the $59.95 by AIT Herbal Marketing. (PX 4, Att. A.) The FTC offered evidence that this credit card charge was facilitated by a credit card processor called First Data. See (PX 5.) Records from First Data show defendant Daniel Lin, as the purported owner of AIT Herbal Marketing, opened a merchant account with First Data. (PX 5, FDC003.) These records also show the actual FTC credit card charge for this second undercover purchase in a log compiled by First Data for AIT Herbal Marketing charges. (PX 5, FDC00386).

On or about February 26, 2004, a package was received at the undercover address in response to the purchase of the Slim Form Patch. The box was addressed to the alias used by Bresnahan and sent via FedEx delivery. There was no invoice in the box. However, the FedEx label was marked as having been sent by Avatar Nutrition from P.O. Box 251570, West Bloomfield, Michigan. (PX 1, Att. K.) This address and the name Avatar Nutrition were also listed on the invoice received from the first undercover purchase. The product contained in the package was a Premium Diet Patch, the same product the FTC received in response to its first purchase. (PX 1, Att. L.)

7

III.    Representations on the Web Sites and Product Packaging

The Web site countupandlookaway.com contained various representations about the Med Diet Patch. A banner is sprawled across the top of the home page and sub-pages in a font larger than most of the other text on the pages. The banner contains the term "Med DIET PATCH," with three purported attributes listed directly under the term in similarly large font: "BURNS FAT", "INCREASES ENERGY", "CONTROLS APPETITE". (PX 1, Att. C., p.1.) Also present in large font near the top of the home page are the following phrases: "LOSE WEIGHT THE EASY WAY," "IT'S NOT A DIET . . . IT'S A PATCH." (Id.) The body of the text on the home page begins with, "Med Diet Patch is a cutting-edge, advanced appetite suppressant, metabolism booster, and energy enhancer ... all in one!" and also contains the sentence, "Just place a new adhesive skin patch anywhere on your body, each day for continuous, safe, and effective weight loss." (Id.)

This Web site keepyourmatehappy.biz contained this representation: "About The Patch: Slim Form Patch is a highly effective weight loss patch developed in Europe by Danish scientists and French biologists." (PX 1, Att. J at 1.) The same page contained the representation: "Non-invasive safe and easy to use, this patch guarantees weight loss with dramatic results." (Id.) The Web site also stated: "Slim For Patch is a 'steady' weight loss system. This means you lose fat. While the patch is working to turn fat into toned muscle, you can eat normally..., without dieting." (Id, at 3.)

The FTC received a Premium Diet Pact in both of its purchases. (PX 1, Att. G, Att. L.) On the front of the packaging of this product, directly under the name Premium Diet Patch, is the phrase "WEIGHT LOSS FORMULA." The back of the package states the following:

> The Premium Diet Patch is specifically formulated to safely stimulate your metabolism, causing your body to use and absorb food more efficiently and to burn fat rather than store it. The patch will assist in decreasing your appetite as well as

increasing your energy, helping your body to lose weight naturally. Use the Premium
Diet Patch every day until you reach your desired weight. It's safe, natural, and easy
to use!

(Id.) The back of the package also contains a set of directions, a list of ingredients, and the following

disclaimer: "These statements have not been evaluated by the Food and Drug Administration. This

product is not intended to diagnose, treat, cure or prevent any disease." (Id.)

IV.     Paper Trail Leading to the Defendants

A.     Corporate Information

The FTC introduced evidence regarding the following information. Phoenix Avatar, LLC

(the name MyPaySystems listed as the vendor of the first undercover purchase) was organized in

Nevada on September 30, 2003, with a registered agent listed as EastBiz.com, Inc. (PX 1, Att. M.)

Records from EastBiz.com pertaining to the formation of Phoenix Avatar, LLC were also introduced

into evidence. (PX 10.) These records show that defendant James Lin, with a billing address of

1350 Chapin, Birmingham, MI, 48009 paid the $833 fee to EastBiz.com required to form an LLC

in Nevada. (PX 10, EB003.) As described below, the records for bank account number 884282030

with National City Bank, controlled by defendants Daniel Lin, James Lin and Mark Sadek, show

an $833 payment to EastBiz.com. (PX 7, EB 00105.)

The FTC introduced into evidence a filing for a Michigan Business Fictitious Name; "AIT

HERBAL MARKETING," with a business address of 634 Woodward Ave., 4th F, Detriot, 48226.

(PX 15.) The record listed a contact name and contact address as defendant Christopher Chung,

7080 Ten Hill Dr., West Bloomfield, MI. (PX 15.) The FTC also offered evidence showing that

"Ait Herbal Mkt," with an address of 7080 Ten Hill Dr., W. Bloomfield, MI, through Mark Sadek,

applied for P.O. Box 251570 in West Bloomfield Michigan (the address both undercover purchases

were received from). (PX 4, Att. P.) The FTC also introduced evidence received from AT&T Corporation relating to the telephone number information it received in making the first undercover purchase of the Med Diet Patch. This telephone number – (866) 248-1101, which was provided by MyPaySystems as the Vendor's Customer Support Line for the first undercover purchase, and listed on the invoice the FTC received in regard to the first undercover purchase – was registered to AIT Herbal Marketing, located at 7080 10 Hill Street, West Bloomfield Michigan. (PX 1, Att. P). AT&T listed the contact name on the account as defendant Mark Sadek. (Id.)

Finally, the FTC offered evidence regarding a filing for a Michigan domestic limited liability company, DJL, LLC. (PX 1, Att. O.) Defendant Daniel Lin was listed as the agent for DJL, LLC in this filing, which listed the registered office address as 1350 Chapman, Birmingham, MI, 48009. (Id.)

### B. Financial Records

The FTC also offered evidence regarding a bank account number 884282030 with National City Bank in the name of DJL, LLC. (PX 1, Att. Q; PX 7, NCB0095.) The signatories on this bank account are defendant Daniel Lin, President; defendant James Lin, Vice President; and defendant Mark Sadek, Director of Operations. Examination of the records of this bank account showed frequent deposits from various credit card merchant processors. (PX 7, NCB0095, NCB 00107-110.) According to Bresnahan, examination of the bank records indicates that from September 2003 to January 2003 the total amount deposited into this bank account was approximately $462,600. (PX 1 ¶ 34(c).) The records also indicate that a payment of $833 was made to EastBiz.com. (PX 7, EB 00105).

The FTC also introduced evidence regarding an account with the credit card processor First

Data. (PX 5.) Defendant Daniel Lin opened a merchant account with First Data under the name AIT Herbal Marketing. (PX 5, FDC003.) The AIT Herbal Marketing merchant account with First Data was identified as account number 267765788885. (PX 5, FDC00386.) The AIT Herbal Marketing merchant application with First Data instructed that credit card payments be deposited into bank account number 884282030. (PX 5, FDC003.) The records of bank account number 884282030 identify repeated deposits from "MERCHANT BANKCD 26776578885" from September 2003 through March 2003. (PX 7, NCB 0097-98, 107-110, 132-33.)

The FTC also offered evidence showing that the defendants purchased numerous Premium Diet Patches from a company called EyeFive in California. Defendant James Lin first contacted EyeFive in late August of 2003 to make a wholesale inquiry that led to the purchase of 500 bottles of VP-RX virility pills. See (PX 12, EF00505-06.) In early November 2003, EyeFive informed Defendant James Lin that it was now marketing the Premium Diet Patch. (PX 12, EF00389-91.) In mid-November 2003, Lin bought 500 premium diet patches for $5.67 each. (PX 12, EF00402; EF0023.) He bought another 200 diet patches in March of 2004, (PX 12, EF0035), and he ordered another 100 diet patches on April 27, 2004. (PX 12, EF0047; EF0027.) All of these products were shipped to DJL, LLC, with an address in New York, New York. (PX 12, EF0023; EF0035; EF0047.)

V.    Expert Testimony Regard the Efficacy of the Premium Diet Patch

The FTC presented evidence from Michael Jensen M.D. ("Jensen"). Jensen is a professor of medicine at the Mayo Medical School, located in Rochester, Minnesota, and a member of the Endocrine Research Unit of the Mayo Clinic. (PX 2 ¶ 1.) Jensen reviewed printouts of the two Web sites, countupandlookaway.com and keepyourmatehappy.biz, as well as a photocopy of the Premium

11

Diet Patch. Jensen found, based upon his professional experience and knowledge, "that none of the ingredients listed on the weight-loss patch label and web site, separately or together, could cause any weight-loss." (Id. ¶ 9.) Jensen also found that "none of the ingredients listed on the weight loss patch label and web site, separately or together, could cause an increase in metabolism, a decrease in appetite, and a reduction of food cravings, thereby enabling users to lose substantial, or any weight." (Id. ¶ 10.)

Under cross-examination Jensen stated that "the standard scientific approach to testing a patch product would be to give an active patch to a group of people and a placebo patch to a group of people and determine the effects between the two groups." (June 4, 2004 Hrg. Tr. at 44.) Jensen did not perform this type of scientific testing and testified that such testing would not have been helpful because the ingredients listed on the Web sites and on the Premium Diet Patch packaging had not been found "individually or in combination in the literature to provide a reasonable mechanism of action that could allow one to predict that they would have the effects they were claimed to have." (Id.)

The defendants introduced into evidence an excerpt from a television broadcast. (DX H.) In this excerpt, a television news show identified as channel 4, but with no city or geographic location noted, compared the effects of four common weight loss products: Slim Fast, a diet patch, diet and exercise, and surgical intervention. (June 4 2004 Hrg. Tr. at 69.) Four contestants were each asked to utilize one of the respective diet methods over a period of four weeks, and the result was that a Mr. Ortiz, who utilized a diet patch, claimed to have lost 25 pounds over a four week period. (Id.) In response to this evidence, Dr. Jensen testified that (1) four weeks is not an adequate time test for treatments of obesity, the Food and Drug Administration, for example, requires one to

12

two years of testing to approve a new product for obesity treatment (June 4 2004 Hrg. Tr. at 66); (2) Mr. Ortiz's claimed success with a diet patch was not probative because Mr. Ortiz was biased as to the outcome of using the patch (Id. at 69); and (3) that this test was at most anecdotal evidence.[4]

VI.     Expert Testimony Regarding Spam

The defendants called Paul H. Howell ("Howell"), Chief Information Technology Security Officer at the University of Michigan, Ann Arbor, Michigan to testify. See (Defs.' Ex. V; Dkt. No. 39, Att. N.) In his "Preliminary Report," Howell explained that e-mail sender and receiver information can be easily forged. (Defs.' Ex. W at 1; Dkt. No. 39, Att. M at 1.) To explain how this information is forged, Howell analogized e-mail to regular mail (e.g., United States Postal Service). (Id. at 2.) Howell explained that both types of mail utilize an outer envelope. The senders of both types of mail generally place their return address on the outer envelope. However, with both types of mail it is possible to provide misleading information in the form of a false return address, which is unreliable for determining the source of the mail. Both types of mail also contain postmarks: computers, which process and forward e-mail, insert a line of test that is analogous to a postmark stamp in regular mail. This "electronic postmark" includes date and time stamps that can be used to trace back the origin of an e-mail. It is possible, however, to insert misleading electronic postmarks in an attempt to conceal the source of an e-mail. Howell testified that the sender information on the e-mails introduced into evidence by the FTC had been forged in an attempt to thwart the identification of the true sender.

According to Howell, the only reliable method for tracing an e-mail back to its true origin

---

[4] The defendants also introduced a number of documents relating to the efficacy of certain herbal supplements in weight loss. Defendants have chosen not to rely upon any of these exhibits in their closing argument, and the court, accordingly, will not consider these documents.

is to confirm the validity of the electronic postmarks and follow those back to the original sending computer. Once the originating computer has been identified, various means may be used to determine who actually sent the e-mail. Howell testified that the FTC failed to follow this procedure by not attempting to identify the sending computer of the e-mails by tracking back the information in the electronic postmarks. Howell concluded that there is no circumstantial or direct technical evidence that links the sending of the e-mails in this case to any particular person. Howell also concluded that the sender information on the e-mails introduced into evidence by the FTC had been forged in an attempt to thwart the identification of the true sender.

The FTC introduced an expert report from Brent Dylan-Rudy Deterding ("Deterding"), Senior Security Analyst at LURHQ, a managed security services provided in Chicago, Illinois. (PX 25.) Deterding testified that senders of spam ("spammers") go to great lengths to obfuscate the true and complete transmission path spam takes.

Deterding testified that spammers' preferred method for hiding their identity is to utilize an "open proxy." (Id.) An open proxy is a computer that, with or often without the owner's knowledge, accepts connections from anyone, anywhere, and forwards the e-mails from those connections as if the e-mails had originated from the open proxy. According to Deterding, these open proxies result from either (1) insecure software that allows a spammer to utilize the open proxy or (2) software maliciously installed on a computer, such as worms, Trojan horses or viruses that turn the computer into an open proxy. (Id. at 2.) Deterding's report stated that it is a widely held opinion in the computer industry that a majority of spam is sent using open proxies. (Id.) Furthermore, ComCast, the nation's largest Internet Service Provider, estimates that nearly 90% of e-mail sent on its network is spam sent through open proxies. (Id.) (citation omitted). Deterding testified that the use of open

proxies makes tracing e-mail back to its true source near impossible. (Id. at 3.) Finally, Deterding concluded that the e-mails introduced by the FTC, that led to the two Web sites countupandlookaway.com and keepyourmatehappy.biz, were sent through open proxies, and, therefore, that there is not a reliable, accurate, technical method to determine the sender of these spam messages. (Id. at 4.)

## STANDARD OF REVIEW

This court reviews the FTC's request for an injunction pursuant to 15 U.S.C. § 53(b) under the "public interest" test, which requires that this court to (1) determine the FTC's likelihood of success on the merits, and (2) balance the equities. FTC v. Word Travel Vacation Brokers, Inc., 861 F.2d 1020, 1028-29 (7th Cir. 1988) ("We believe that the legislative history of section 13(b) makes it quite clear that the 'public interest' test is the correct approach."). Under the "public interest" test, "the FTC need not prove irreparable injury to obtain a preliminary injunction." Kinney v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO, 994 F.2d 1271, 1277 (7th Cir. 1993). The threshold showing of a likelihood to succeed under the traditional test is a better than negligible chance of success on the merits, and this court adopts that standard here. See Cooper v. Salazar, 196 F.3d 809, 813 (7th Cir. 1999).

Under the public interest test, "private concerns may certainly be considered, [but] public equities must receive far greater weight." World Travel Vacation Brokers, Inc., 861 F.2d at 1029; see also FTC v. Weyerhaeuser Co., 665 F.2d 1072, 1083 (D.C. Cir. 1981) ("When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone would not suffice to justify denial of a preliminary injunction."). That is not to say, however, that private equities receive no weight, as the Seventh Circuit has explained: "While not giving *controlling*

15

weight to 'private equities' – of course not – the cases give them *some* weight." FTC v. Elders Grain, Inc., 868 F.2d 901, 903 (7th Cir. 1989). "[P]rivate equities are entitled to serious consideration," especially where the defendant "can show irreparable injury to it from the grant of an injunction." Id. "[I]f the defendant can show irreparable injury to it from the grant of the injunction, then merits and harms must be evaluated in the usual way." Id. This "usual way" would involve a "sliding scale" approach. Id.; see also Ty, Inc. v. Jones Group Inc., 237 F.3d 891, 895-96 (7th Cir. 2001). This sliding scale approach requires that the court factor the FTC's probability of success on the merits into the balance of the harms. Thus, "[t]he greater the plaintiff's likelihood of success on the merits . . . the less harm from denial of the preliminary injunction the plaintiff need show in relation to the harm that the defendant will suffer if the preliminary injunction is granted." Elders Grain, Inc., 868 F.2d at 903. "The sliding scale approach is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" Ty, Inc., 237 F.3d at 896 (citations omitted).

## ANALYSIS

### I.    FTC's Likelihood of Success on the Merits

To establish a likelihood of success on the merits, the FTC must show a violation of the law that the defendants committed. The two statutes allegedly violated by the defendants are the FTC Act and CAN-SPAM. The court will first address whether these statutes have been violated and then, evaluating all of the evidence, the court will analyze the FTC's likelihood of success in establishing the defendants' liability at a trial on the merits.

## A.    Violations of the FTC Act and CAN-SPAM

### (i)    FTC Act

The FTC Act states, in pertinent part: "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." 15 U.S.C. § 45(a)(1). The FTC Act also prohibits the dissemination of false advertisement for the purpose of inducing the purchase of a drug or device. 15 U.S.C. § 52(a). The FTC Act deems such dissemination of false advertisement "an unfair or deceptive act of practice in or affecting commerce within the meaning of section 45." 15 U.S.C. § 52(b). The Seventh Circuit has explained that "representations . . . likely [to] mislead consumers, acting reasonably, to their detriment" are deceptive within the meaning of section 45(a)(1) of the FTC Act. FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988) (citation omitted). "In addition, '[m]isrepresentations of material facts made for the purpose of inducing consumers to purchase services constitute unfair or deceptive acts or practices." Id. (citation omitted). The "misrepresentation or practice need not be made with an intent to deceive" to violate the FTC Act. In general, advertisements are considered deceptive if the proponent lacked a reasonable basis for asserting its truth. See Kraft, Inc. v. FTC, 970 F.2d 311, 314 (7th Cir. 1992); FTC v. Pantron I Corp., 33 F.3d 1088, 1096 (9th Cir. 1994); Thompson Medical Co. v. FTC, 791 F.2d 189, 193-94 (D.C. Cir. 1986). See also FTC v. Sabal, 32 F.Supp.2d 1004, 1007 (N.D. Ill. 1998).

This court rules that the FTC has a better than negligible chance of success on the merits of its claim that the representations regarding the Premium Diet Patch ("diet patch") are deceptive. The Web sites and packaging of the diet patch made express claims that the diet patch would cause weight loss by suppressing appetite and boosting metabolism. The packaging represented that the

diet patch was a "weight loss formula," and that using the diet patch would "safely stimulate your metabolism, causing your body to use and absorb food more efficiently and to burn fat rather than store it." The two Web sites that the FTC utilized to purchase the product contained similar representations, describing the diet patch as "a highly effective weight loss patch."

The evidence presented at the hearing showed that these representations were false. In sum, Dr. Jensen testified that there is no scientific evidence relied upon by the medical community that would suggest that the diet patch the defendants sold or advertised on the two Web sites would cause any weight loss, increase metabolism, or decrease appetite. The evidence submitted by the defendants to the contrary does not detract from Dr. Jensen's conclusions, and certainly does not provide substantiation for the defendants' contention that the diet patch representations are not deceptive.

The defendants argue that the following disclaimer, present on the diet patch packaging, proves that it does not violate the FTC Act: "These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease." But this disclaimer does not address, much less deny, the representations regarding weight loss and therefore cannot cure the deceptive representations. FTC v. US Sales Corp., 785 F. Supp.737, 751 (N.D. Ill. 1992) ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression.")

The main thrust of defendants' opposition to liability under the FTC Act is the argument, without any citation to legal authority, that the FTC cannot be successful on the merits of its claims without providing evidence of a specific consumers being "defrauded" or harmed. The FTC has

made the required showing that the defendants' claims are false, and therefore "deceptive" under the act. The FTC has also made the required showing that consumers relied upon these deceptive claims. "[O]nce the FTC shows (1) that a reasonably prudent person would rely on the deceptive advertisements, (2) that these advertisements were widely disseminated, and (3) that consumers purchased the product, '[t]he burden shifts to the defendants to prove that the representations were not relied upon by the consumers.'" FTC v. World Traveler Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988)(citation omitted). The false representations about weight loss were disseminated over the Internet and the FTC has presented evidence establishing that the defendants purchased at least 800 diet patches in three separate orders over a six-month period. The fact that defendants continued to purchase diet patches leads to the conclusion that consumers were purchasing the diet patches – a conclusion buttressed by the bank records indicating numerous deposits into the defendants' bank account from credit card processors.

Accordingly, this court rules that the FTC has demonstrated a better than negligible chance of success on the merits of its claims that representations on the Web sites countupandlookaway.com and keepyourmatehappy.biz, as well as on the packaging of the diet patch violate the FTC Act.

(ii)    Violations of CAN-SPAM

On January 1, 2004, the Controlling the Assault of Non-solicited Pornography and Marketing Act of 2003 ("CAN-SPAM") went into effect. In this legislation, Congress made the finding that electronic mail had not only "become an extremely important and popular means of communication, relied on by millions of Americans on a daily basis," but that it also served an important role "for the development of frictionless commerce." 15 U.S.C. § 7701(a)(1). These great benefits for society and economy are, however, "threatened by the extremely rapid growth in the volume of unsolicited

19

commercial electronic mail." § 7701(a)(2). According to Congress, unsolicited commercial electronic mail, or spam, "account[s] for over half of all electronic mail traffic, up from an estimated 7 percent in 2001." § 7701(a)(2). The prevalence of spam significantly detracts from the efficiency and convenience of electronic mail. See §§ 7701(a)(3), (a)(4), (a)(5), (a)(6). Congress specifically listed what it considered to be the evils of spam: that its source and purpose for being sent are often disguised, §§ 7701(a)(7), (a)(8); that senders of spam often do not provide its recipients with the ability "to reject (or "opt-out" of) receipt" of the spam, § 7701(a)(9); and that senders of spam are able "to gather large numbers of electronic mail address on an automated basis from Internet websites . . . where users must post their addresses in order to make full use of the website or service." § 7701(a)(10).

> Based upon these findings, Congress determined that:
>
> (1) there is a substantial government interest in regulation of commercial electronic mail on a nationwide basis;
> (2) senders of commercial electronic mail should not mislead recipients as to the source or content of such mail; and
> (3) recipients of commercial electronic mail have a right to decline to receive additional commercial electronic mail from the same source.

§ 7701(b). Finally, CAN-SPAM specifically notes that "[i]t is the sense of Congress that . . . Spam has become the method of choice for those who distribute pornography, perpetrate fraudulent schemes, and introduce viruses, worms, and Trojan horses into personal and business computer systems." § 7703(c).

In accordance with the preceding Congressional findings, CAN-SPAM imposes certain requirements on those who "initiate the transmission of commercial electronic mail message[s]."

§ 7704(a)(1).[5]   Commercial e-mail messages must not contain materially false or misleading information regarding its source or deceptive subject headings. §§ 7704(a)(1), (a)(2).  Commercial e-mail messages must contain: (1) a return email address or other "opt-out" mechanism that allows a recipient to voice his or her objection to further receipt, (2) a clear identification that it is a commercial advertisement or solicitation[6], (3)a clear notice of the ability to "opt-out," and (4) the sender's physical postal address. §§ 7704(a)(3), (a)(5).  CAN-SPAM also makes it unlawful to send commercial e-mails to a recipient who has "opted-out." § 7704(a)(4).  A violation of CAN-SPAM "shall be enforced by the [FTC] as if the violation . . . were an unfair or deceptive act or practice." § 7706(a)

There is no dispute that the e-mails in question violate CAN-SPAM.  These e-mails, in fact, violate most, if not all, of CAN-SPAM's major provisions.  Both of the technical experts testified at the preliminary injunction hearing that the e-mail messages marketing the two Web sites countupandlookaway.com and keepyourmatehappy.biz concealed the identify of the sender, violating section 7704(a)(1)'s requirement that e-mail messages shall not contain "header information that is materially false or materially misleading."[7]  Furthermore, the e-mails do contain neither a

---

[5] "The term 'initiate,' when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message.  For purposes of this paragraph, more than one person may be considered to have initiated a message." 15 U.S.C. § 7702(9).

[6] This requirement does not apply "if the recipient has given prior affirmative consent to receipt of the message." § 7704(a)(5)(B).

[7] "The term 'header information' means the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message." § 7702(8).

conspicuous notice of the ability to "opt-out,"nor the sender's physical postal address, nor a clear notice that the e-mails are commercial solicitations. All of these omissions violate CAN-SPAM. § 7704(a)(5)(A).

While defendants have not disputed that the e-mails violate CAN-SPAM, they have attempted to mount a constitutional challenge to CAN-SPAM itself. According to the defendants, CAN-SPAM "prohibits various e-mail messages which omit certain information, and accordingly, is a content-based Internet restriction, which is presumed invalid." (Defs.' Closing at 21.) Defendants support this conclusory statement with a quote from the Supreme Court's recent decision in Ashcroft v. American Civil Liberties Union, 124 S.Ct. 2783 (2004), in which the Supreme Court held that the Child Online Protection Act ("COPA"), 47 U.S.C. § 231, was an invalid content based restriction. This court will only consider the single constitutional argument raised by defendants. Defendants contention that a prohibition on e-mails omitting certain information – or a requirement of disclosures – amounts to content-based restrictions on speech is rejected because it "overlooks material differences between disclosure requirements and outright prohibitions on speech." Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 105 S.Ct. 2265, 2281 (1985). In short, requiring disclosure of information does not amount to a content-based restriction. See Id. Accordingly, defendants constitutional claim fails.

      B.     Defendants' Responsibility for Violations of the FTC Act and CAN-SPAM

In the Finding of Facts section, the court has laid out in detail the evidence the FTC has presented to tie the defendants to the deceptive practices and violations of CAN-SPAM. The evidence connects the defendants to the entities selling the diet patches from the two Web sites countupandlookaway.com and keepyourmatehappy.biz and also establishes that the money spent

purchasing the diet patches ended up in the defendants' possession.

Phoenix Avatar, LLC was listed by MyPaySystems as the vendor selling diet patches from countupandlookaway.com, and AIT Herbal Marketing was listed on the invoice from this purchase, and AIT Herbal Marketing appeared on the FTC's credit card statement for the second purchase. Thus, the evidence establishes that Phoenix Avatar, LLC, and AIT Herbal Marketing were selling the diet patches marketed on the Web sites countupandlookaway.com and keepyourmatehappy.biz.

The fact that these entities used these Web sites to sell their products establishes that they are likely responsible for the content of the Web sites. Similarly, the entities are likely responsible for the offending spam, which functioned as advertisements for the Web sites. The offending spam contained hyperlinks to these Web sites and also contained advertisements such as "Amazing patch makes you shed the pounds!" which directed recipients of the spam to the Web sites. (PX 4, Att. L, M.) Accordingly, it is quite likely that the entities utilizing the Web sites to sell diet patches initiated the transmission of the spam advertising the Web sites.

This conclusion is not undermined by the absence of technical evidence tracing the spam in this case back to its source. Both experts testified to the difficulties of determining the source of spam, due to the fact that those who send spam go to great lengths to hide their identities. And both experts testified that the e-mails in this case contain misleading information inserted for the purpose of obfuscating their true source. The FTC's expert also testified that no technical method existed to determine the source of the e-mails because of the use of open proxies. Technical evidence connecting a person or an entity to spam would certainly be persuasive. However, it is not necessary to prove a violation of CAN-SPAM, as the definition of "initiate" in CAN-SPAM makes clear. Liability is not limited to those who physically cause spam to be transmitted, but also extends to

those who "procure the origination" of offending spam. 15 U.S.C. § 7702(9). The technical evidence attested to by defendants' expert Howell could not establish who "procure[d] the origination" of spam. Therefore, the statute necessarily contemplates the use of nontechnical evidence to prove the source of offending spam.

Finally, the evidence connects the defendants to these two entities that are likely responsible for the deceptive practices and CAN-SPAM violations described above. Defendant James Lin, utilizing his bank account 884282030 jointly controlled with defendants Daniel Lin and Mark Sadek, paid the fee required to form Phoenix Avatar, LLC. The record also establishes that defendant Christopher Chung registered the Fictitious Business Name AIT Herbal Marketing, which was listed on the invoice the FTC received from its first undercover purchase. AIT Herbal Marketing, through M. Sadek, applied for the P.O. Box 251570, from which both undercover purchases were shipped. The FTC's undercover credit card was billed by AIT Herbal Marketing for the second undercover purchase. The evidence establishes that credits to AIT Herbal Marketing's merchant account with a credit card processor were deposited into bank account 884282030. The FTC has shown that the defendants are likely the individuals acting through the entities Phoenix Avatar, LLC and AIT Herbal Marketing.

At this stage of the litigation, the court is also not swayed by defendants mere assertion that the FTC has failed to offer evidence of the defendants' "actual knowledge and/or participation in what the FTC claims to be deceptive acts and practices." (Defs.' Closing at 18.) See FTC v. Amy Travel Service, Inc., 875 F.2d 564, 573-74 (7th Cir. 1989). This standard applies when determining which individuals to hold liable after corporate liability is established. Id. However, AIT Herbal Marketing, the entity purporting to sell both diet patches is not a corporation. It is simply a fictitious

business name, and the evidence introduced by the FTC shows that the individuals using and profiting from this name are the defendants. Finally, the FTC has shown the defendants "active involvement in [the] business affairs" of Phoenix Avatar, LLC, which is "probative of [their] knowledge" of that company's deceptive acts and practices. Id. at 574.

Accordingly, this court finds that the FTC has a better than negligible chance of success in showing that the individual defendants are responsible for the violations of the FTC Act and CAN-SPAM.

II.     Balancing The Equities

As this court has explained, under the "public interest" test, public interests are given far greater weight than private equities, which is not to say though that private equities should not be considered, especially where the defendant may face irreparable injury. See FTC v. Elders Grain, Inc., 868 F.2d 901, 903 (7th Cir. 1989). The defendants contend that the public equities in this case are low or nonexistent because the FTC has failed to produce evidence of consumers complaining of harm from the defendants practices. This court disagrees. The public has an important interest in a violation of the law. The public would be harmed by continued violations of the law. The FTC has shown a high likelihood success on its claim that the defendants have violated both the FTC Act and CAN-SPAM. Accordingly, the public interest in this case is great. Id. (Ripple, J. concurring) ( "A strong showing by the government that a violation of law has occurred necessarily produces 'public equities' that must 'receive far greater weight' than 'private equities.'").

Furthermore, despite defendants' argument to the contrary, the FTC has shown a concrete harm to individual members of the public. The FTC has shown (1) that it is likely that the defendants are misrepresenting the effects of their product to the public and (2) that the defendants

are barraging the public with spam. Both of these practices cause harm to actual individuals in the public. Those who purchase the defendants' diet patches are not receiving the product for which they paid. Those who receive defendants' spam are forced to incur the costs of needlessly expended energy and time evaluating and eventually discarding defendants' unsolicited messages falsely advertising weight loss products.

This court also rejects defendants' second primary argument attacking the existence of a public interest – that other corporations and entities are selling similar diet patches and the FTC has produced no evidence that these entities are being enjoined. Defendants, unsurprisingly, cite no case law for their proposition that the public interest in enforcing the law is low when others also violate the same law. This court declines to so hold.

As the case law makes clear, a countershowing of private equities may justify denial of a preliminary injunction only when these private equities are significant. See Elders Grain, Inc., 868 F.2d at 903. Defendants have not presented any irreparable injury that would justify tipping the balance of equities in their favor.

Defendants argue that the requested injunction should not be granted because "it may directly infringe" on the defendants' Fourth, Fifth and Sixth Amendment rights. (Defs.' Closing at 19.)[8] The fact that something "may" happen hardly amounts to irreparable injury. Furthermore, the court does not find that any of defendants' constitutional rights will be violated by the preliminary injunction. The defendants' Fifth Amendment argument is premature. FTC v. World Travel Vacation Brokers,

---

[8] In a footnote, defendants incorporate by reference their Joint Mot. to Dissolve the Ex Parte Temporary Restraining Order and reiterate their argument that the TRO violates their Fifth and Sixth Amendment rights. (Defs.' Closing at 19, n.6). Defendants arguments regarding the ex parte nature of the TRO are moot give this court's ruling granting the FTC's request for a preliminary injunction made after the defendants have been heard.

Inc., 861 F.2d 1020, 1031 (7th Cir. 1988) ("Until the . . . defendants submit the proper records to the district court, and the court refuses to lift the freeze, [defendants'] self-incrimination claim is premature."). The preliminary injunction also does not prohibit the defendants from retaining counsel, nor does it prohibit defendants from using frozen funds to pay counsel. It merely requires that defendants account for funds paid to attorneys.

Finally, the court rejects the defendants argument that the asset freeze in particular is an unjustified burden on them due to the fact that the FTC has not presented any evidence of consumer harm. The FTC has signaled its intent to seek restitution in the event it is eventually successful in this matter, and this court has already found a likelihood of success on its claim that defendants have engaged in deceptive practices in relation to selling diet patches. Accordingly, restitution may well be appropriate at the conclusion of this matter and this court has a duty to ensure that such restitution will be possible. World Travel Vacation Brokers, Inc., 861 F.2d at 1031 ("[T]he district court [has] a duty to ensure that the assets of the corporate defendants were available to make restitution to the injured customers.").

Considering the equities, this court finds that the balance of equities favors the FTC because the defendants have not demonstrated any significant, much less irreparable injury to them from the FTC's requested preliminary injunction. This conclusion is strengthened when the court factors into the balance the FTC's likelihood of success. For purposes of applying the sliding scale analysis, this court finds the FTC's likelihood of success on the merits as greater than a mere better than negligible chance. The FTC has amassed a persuasive chain of evidence connecting the defendants to violations of the FTC Act and CAN-SPAM. This evidence is sufficient to support by a preponderance of the evidence the finding sought by the FTC against the defendants. This strong showing, coupled with the presumption that public equities receive far greater weight than private

equities, establishes that the balance of equities favors the FTC in this case.

CONCLUSION

Accordingly, the request for a preliminary injunction against defendants Daniel J. Lin, Mark M. Sadek, James Lin, and Christopher Chung is granted. It is therefore ordered that defendants, and their agents, servants, employees, attorneys, and those persons or entities in active concert or participation with them who receive actual notice of this order by personal service, or otherwise, are hereby preliminarily enjoined from doing, or assisting others in doing, the following acts:

1. Expressly or by implication:

> (a). Representing that the Med Diet Patch, Slim Form Diet Patch, or any other diet patch, causes weight loss;

> (b). Misrepresenting that any product, or any ingredient contained in it, increases metabolism, decreases appetite, and/or reduces food cravings;

> (c). Misrepresenting that any product, or any ingredient contained in it, is effective in the diagnosis, cure, mitigation, treatment, or prevention of any disease;

> (d). Making any representation about the health benefits, performance, efficacy, or safety of any product unless, at the time of making such representation, defendants possess and rely upon competent and reliable scientific evidence that substantiates the representation;

> (e). Misrepresenting any other fact material to a consumer's decision to purchase any product.

2. Violating the provisions contained in sections 5 and 6 of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C. §§ 7704 and 7705 by initiating the transmission of a commercial electronic mail message that:

28

(a). Contains, or is accompanied by, false or misleading header information in violation of section 5(a)(1) of the CAN-SPAM Act, 15 U.S.C. § 7704(a)(1);

(b). Fails to include a clear and conspicuous notice of the opportunity to decline to receive further electronic mail messages from the sender, in violation of section 5(a)(5)(ii) of the CAN-SPAM Act, 15U.S.C.§7704(a)(5)(ii);and/or

(c). Fails to include a valid physical postal address of the sender in violation of section 5(a)(5)(iii) of the CAN-SPAM Act, 15 U.S.C. § 7704(a)(5)(iii).

3.  (a). Selling, liquidating, assigning, transferring, converting, loaning, encumbering, pledging, concealing, dissipating, spending, withdrawing, or otherwise disposing of any funds, real or personal property, or other assets or any interest therein, wherever located, including any assets inside or outside the territorial United States, which are:

(1.) in the actual or constructive possession of any defendant;

(2.) owned or controlled by, or held, in whole or in part, for the benefit of, or subject to access by, or belonging to, any defendant; or

(3.) in the actual or constructive possession of, or owned or controlled by, or subject to access by, or belonging to, any corporation, partnership, trust or any other entity directly or indirectly owned, managed, or controlled by, or under common control with, any defendant, except as agreed to by the FTC through counsel.

(b). Opening or causing to be opened any safe deposit boxes titled in the name of any defendant, or subject to access by any defendant;

(c). Incurring charges on any credit card issued in the name, singly or jointly of any defendant;

(d). Transferring any funds or other assets subject to this order for attorney's fees or living expenses, except from accounts or other assets identified by prior written notice to the FTC; provided that no attorney fees or living expenses, other than those set forth below and only in accordance with the procedures set forth below, shall be paid from funds or other assets subject to this order.

## PAYMENTS OF LIVING EXPENSES AND ATTORNEY FEES ALLOWED

Notwithstanding the above, any defendant may pay from his personal funds reasonable, usual, ordinary, and necessary living expenses and attorney fees. No such expenses, however, shall be paid from funds subject to this order except from an account designated by written notice to counsel for the FTC prior to the payment.

## FUNDS, PROPERTY AND ASSETS AFFECTED

The funds, property and assets affected by this order shall include both existing assets and assets acquired after the effective date of this order, during the pendency of this lawsuit, including without limitation, those acquired by loan or gift. defendants shall hold all assets, including without limitation, payments, loans, and gifts, received after service of this order.

## MAINTAINING RECORDS

Defendants and their agents, servants, employees, attorneys, and those persons or entities in active concert or participation with them who receive actual notice of this order by personal service, or otherwise, are hereby also ordered to maintain all records in their possession or control pertaining to the above.

## DURATION AND EFFECT OF THIS ORDER

This order supercedes the TRO (Dkt. No. 6) entered in this case. This order shall remain in effect during the pendency of this case, through a trial on the merits, and until entry of a final judgment or further order of court, whichever occurs first. No security is required pursuant to Federal Rule of Civil Procedure 65(d).

Counsel are to confer pursuant to Federal Rule of Civil Procedure 26(f) and file a jointly completed Form 35 Report of Parties' Planning Meeting on or before August 17, 2004. This case is set for a report on status and entry of a scheduling order at 9:00 a.m. on August 31, 2004.

ENTER:

_James F. Holderman_

JAMES F. HOLDERMAN
United States District Judge

DATE: July 29, 2004